UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADAM ENGWEILER,

    Plaintiff,

v.

HOWMET AEROSPACE INC.,

    Defendant.
_____/

Case No. 1:24-cv-975

Hon. Hala Y. Jarbou

## **OPINION**

    Adam Engweiler was an engineer at Howmet Aerospace until his back pain worsened to the point that he felt he could no longer work a full-time job.  In May 2021, Engweiler applied for the long-term disability benefits to which he was entitled under the company's group benefit plan, and Howmet—acting through its claims administrator, the Hartford Life and Accident Insurance Company—accepted the claim, as Hartford found that Engweiler could no longer do his job.  But in December 2023, Hartford terminated Engweiler's disability claim on the grounds that he was not disabled from any gainful occupation for which he is suited, the more expansive definition of disability applicable after a beneficiary has been out of work for longer than twenty-four months.

    Engweiler asked Hartford to reconsider, but it stood by its decision.  He filed the instant action in response, invoking the private right of action the Employee Retirement Income Security Act (ERISA) of 1974 confers on employees seeking to recover benefits due under the terms of a group plan.  Engweiler now moves for judgment on the administrative record.  Because the Court finds that Hartford did not act arbitrarily in terminating Engweiler's benefits, the motion is denied and the case is dismissed.

## I.   BACKGROUND

A.   **Engweiler's Initial Award of Long-Term Disability Benefits**

Adam Engweiler began suffering from back pain no later than 2012 (ECF No. 13-2 at PageID.440).[1] Engweiler had been working for Howmet Aerospace for a little over five years (ECF No. 13-5 at PageID.1010) when in July 2020 orthopedic surgeon Mark Moulton found him to have a grade 1 isthmic spondylolisthesis of the L5-S1 joint (in layman's terms, that the L5 vertebra had slipped ahead of the S1 vertebra beneath it) (ECF No. 13-2 at PageID.399). After conservative treatments failed, in August 2020 Engweiler elected to undergo surgery to fuse his L5 and S1 vertebrae, accomplished through the installation of a lordotic cage. (*Id.* at PageID.342–.343.)

Engweiler seemed to respond to the surgery well. Other than one flare-up in October 2020, which Dr. Moulton treated with an injection of the NSAID ketorolac (*id.* at PageID.390), Engweiler reported "feel[ing] actually quite well" and noted an improvement in his lower back pain as late as March 2021 (*id.* at PageID.377). According to Engweiler's physician's assistant, the surgery also provided lasting relief from the leg pain that had previously accompanied his back pain. (*Id.* at PageID.440.)

Over the course of the following April, however, Engweiler's back pain returned. (*Id.* at PageID.374.) The resurgence appears to have been precipitated by Engweiler's bending over to pick up his phone charger. (ECF No. 13-3 at PageID.615, .621.) By early May, Engweiler was reporting that he was in enormous pain and was having difficulty standing and walking. (ECF No. 13-2 at PageID.370.) Dr. Moulton restricted Engweiler from standing for longer than thirty

---

[1] The entire administrative record is on the docket. (ECF No. 13.) Howmet's disability benefits plan is attached as Exhibit A (ECF No. 13-1), while the remainder of the record is attached as Exhibit B, which is broken up into twelve subparts because of the size of the record. (ECF Nos. 13-2 to -13). Exhibit C (ECF No. 13-14) is a privilege log.

2

minutes at a time and instructed him to lay down throughout the day. He also said that Engweiler could not work unless he could sit, stand, or walk for less than an hour during the workday. (*Id.*) This led Engweiler to submit a claim for long-term disability benefits under Howmet's group plan on May 21, 2021. (*Id.* at PageID.59.) The definition of "disabled" that Engweiler had to satisfy at this initial stage was one tied to his current position at Howmet: Engweiler had to show that he could not "perform each of the material duties of" his "regular job." (ECF No. 13-1 at PageID.44.) The claim was approved on June 8, retroactive to May 11. (ECF No. 13-2 at PageID.73.)

Engweiler continued to pursue treatment options after being placed on long-term disability leave. In August 2021, Engweiler underwent epidural steroid injections at the L5 vertebra (*Id.* at PageID.149.) The injections did not bring Engweiler relief. (ECF No. 13-3 at PageID.480.) The following month, Engweiler's primary-care physician, Diane Parrett, referred him to a rheumatologist for an assessment of whether the root cause of his back pain was an autoimmune disease like ankylosing spondylitis. (*Id.* at PageID.671.) After examining images of Engweiler's spine and assessing his symptoms, the rheumatologist concluded that Engweiler's troubles were not inflammatory in nature. (*Id.* at PageID.590, .650.)

In February 2022, Engweiler was referred to a specialist for the installation of a spinal cord stimulator, a device that can provide relief from lower back pain by emitting minute electrical currents intended to impede transmission of pain signals up the spinal cord to the brain.[2] (ECF No. 13-2 at PageID.435.) The device did not alleviate Engweiler's pain, and the lead appears to have slipped from the T8 vertebra near which it was installed, so the stimulator was removed in March. (*Id.* at PageID.431.) After running into this dead end, it appears that Engweiler began

---

[2] Chakravarthy et al., Mechanism of Action in Burst Spinal Cord Stimulation: Review and Recent Advances, 20 Pain Medicine (Supp. 1) S13, S19 (2019), https://doi.org/10.1093/pm/pnz073.

3

attending physical therapy in September 2022, but no details concerning the efficacy of the training regimen appear in the claim record. (ECF No. 13-6 at PageID.1193, .1199.)

Toward the end of 2022, Engweiler and Dr. Moulton explored Engweiler's undergoing another surgery to alleviate his back pain. (*Id.* at PageID.1202). Dr. Moulton's hypothesized that the protrusion of the disc separating Engweiler's L4 and L5 vertebrae, which Dr. Moulton had previously regarded as "mild" (*id.* at PageID.1216) but which had now become a small herniation, could be contributing to Engweiler's symptoms (*id.* at PageID.1202). Engweiler stated that he was not prepared to undergo surgery again until he received a second opinion. (*Id.* at PageID.1194.) At the beginning of the new year, Dr. Moulton referred Engweiler to the Mayo Clinic, which informed Engweiler that it could not take him on as a patient. (*Id.* at PageID.1161.)

Having exhausted all treatment options other than additional surgery, an intervention whose chances of ameliorating Engweiler's pain at least one of his physicians considered dubious (*see* ECF No. 13-2 at PageID.444; ECF No. 13-7 at PageID.1417), Engweiler settled into a regimen of pain management, with Dr. Parrett keeping him on a maintenance dose of hydrocodone/acetaminophen and tramadol. (ECF No. 13-7 at PageID.1353.) The last time Dr. Moulton opined on Engweiler's condition before Hartford gave notice that it intended to terminate Engweiler's long-term benefits was in March 2023. Dr. Moulton did not depart from the evaluation of Engweiler's condition made after Engweiler's January 2023 office visit (*see* ECF No. 13-6 at PageID.1193), and he reiterated the restrictions he placed on Engweiler's physical activity all the way back in May 2021. (*Id.* at PageID.1162.)

**B.     Social Security Claim**

Howmet's benefits plan requires those eligible for long-term disability benefits to offset part of the cost of the benefits by applying for Social Security Disability Insurance (SSDI) (ECF No. 13-1 at PageID.41–.42; *see* ECF No. 13-12 at PageID.2054 (explaining that plan benefits are

4

intended to provide a "constant replacement ratio of your pre-disability income")). Allsup, which Hartford entrusts with handling Social Security claims for beneficiaries, submitted an SSDI application on Engweiler's behalf in February 2022. (ECF No. 13-2 at PageID.105.)

The Social Security Administration (SSA) denied Engweiler's application late the following March. (ECF No. 13-5 at PageID.974.) The initial determination found that Engweiler's symptoms were consistent with his retaining the residual functional capacity to engage in sedentary labor. (ECF No. 13-4 at PageID.866.) The determination stated that Engweiler should stand or walk for no more than two hours during an eight-hour workday, but no medical rationale was provided for that limitation, or for the accompanying finding that Engweiler could work for six hours a day in a seated position. (*See id.* at PageID.865–.866.)

Allsup sought reconsideration of that decision, but the denial was reaffirmed toward the end of August. (ECF No. 13-5 at PageID.958.) Responding to Dr. Moulton's assessment that Engweiler could not sit, stand, or walk for longer than an hour during a standard workday, the SSA found that Dr. Moulton's opinion "relie[d] heavily on the subjective report of symptoms and limitations provided by" Engweiler, with the result that Dr. Moulton overstated the restrictions Engweiler's back pain imposed on his capacity to work while seated. (*See* ECF No. 13-4 at PageID.851.)

Allsup then requested a hearing, which was scheduled for May 2023. (ECF No. 13-2 at PageID.124.) After the hearing, the administrative law judge tasked with adjudicating Engweiler's claim found him to be disabled from work appropriate to his age, education, and skills. (ECF No. 13-4 at PageID.843.) The ALJ noted that the finding that Engweiler could engage in six hours of sedentary work a day was based on the assessment of a consultant for Michigan's human-services department, an assessment the ALJ found to be unpersuasive because it was not based on

5

treatment or examination of Engweiler and because it was made without the benefit of the medical evidence submitted at the hearing. (*Id.* at PageID.841.) The ALJ found the opinion of Dr. Moulton, who had a long history of treating Engweiler, more consistent with the medical evidence, and he expressed skepticism that someone with an employment record as "outstanding" as Engweiler's would suddenly prefer malingering to returning to his nearly sedentary job at Howmet. (*Id.* at PageID.842.) Finally, the ALJ adopted the analysis of an impartial vocational expert that Engweiler could not perform any gainful labor that was both sedentary in nature and commensurate with his age, education, and experience. (*Id.* at PageID.843.)

C.  **Hartford's Termination of Engweiler's Long-Term Disability Award**

Howmet's benefits plan defines a beneficiary as totally disabled—and as a result eligible for long-term disability benefits—differently depending on how long the beneficiary has been receiving benefits. (ECF No. 13-1 at PageID.44.) For twenty-four months after the onset of the disability, a beneficiary is totally disabled if they are unable to perform the functions associated with their position at the company. After this two-year period, a beneficiary must be incapable of "perform[ing] each of the material duties of any gainful occupation for which" they "are suited by training, education or experience" to remain eligible for long-term disability benefits. (*Id.*) Because Engweiler's effective onset date was the end of May 2021 (ECF No. 13-2 at PageID.69), Engweiler became subject to the any-gainful-occupation standard at the end of May 2023. In August 2022, Hartford duly notified Engweiler that it would be reviewing his continued entitlement to long-term disability benefits after the new standard kicked in (ECF No. 13-12 at PageID.1944–.1945), and over the coming months it invited Engweiler and his medical providers to submit evidence of his current condition. (*Id.* at PageID.1945, .1969, .1998, .2022.) Hartford also interviewed Engweiler (ECF No. 13-2 at PageID.277), and it independently requested

6

documentation of the diagnoses and treatments of Engweiler's attending physicians (*id.* at PageID.170–.177).

In addition to amassing the existing medical record, Hartford contracted with orthopedic surgeon John Anderson to conduct his own evaluation of Engweiler's condition. (ECF No. 13-7 at PageID.1409–.1412.) Dr. Anderson's evaluation consisted of reviewing Engweiler's medical records through his visit with Dr. Parrett in September 2023, as well as an examination of Engweiler's physical condition.[3] (*Id.* at PageID.1417–.1419.) Dr. Anderson found that Engweiler's lumbar range of motion was approximately half the normal range and that the muscles adjacent to Engweiler's lower spine were tender to the touch. (*Id.* at PageID.1420.) Dr. Anderson found these symptoms to impose no limitations at all on Engweiler's physical capacities. (ECF No. 13-13 at PageID.2086.) On the other side of the scale lay the strength of Engweiler's lower extremities, the normality of his gait and station, his ability to mount and alight from the examination table without difficulty, and the negative result of the straight-leg test. (ECF No. 13-7 at PageID.1420.) Dr. Anderson acknowledged that Engweiler suffered from "chronic pain," but he denied that "any functional deficit [could] be identified." (*Id.* at PageID.1421.) He explicitly concluded that Engweiler could "constantly" sit, stand, or walk.

Based on Dr. Anderson's assessment, Hartford terminated Engweiler's long-term disability benefits in December. (ECF No. 13-13 at PageID.2133.) Engweiler appealed the termination of his benefits in June 2024. (ECF No. 13-8 at PageID.1494.) He submitted additional medical evidence alongside the appeal, including a reiteration of Dr. Moulton's assessment of Engweiler's

---

[3] Dr. Anderson also acknowledged some problems with Engweiler's upper back. Specifically, Dr. Anderson determined that the range of motion of Engweiler's cervical spine was approximately 25 percent below average. (ECF No. 13-7 at PageID.1419.) He also noted that the tenderness to palpation Engweiler's upper trapezius exhibited was consistent with the cervical spondylosis that his physician assistant diagnosed in June 2023. (*Id.*) Engweiler has never claimed that his upper-back problems contribute to his disability, so the Court sets these symptoms aside.

7

inability to sit, stand, or walk for more than an hour during a normal workday (*id.* at PageID.1499); notes from visits with Dr. Moulton in January, February, and March 2024 finding Engweiler's condition essentially unchanged (*id.* at PageID.1507, .1505., .1503, .1501, .1510); and notes from his visit with Dr. Parrett in December 2023 making the same finding (*id.* at PageID.1571).

Hartford enlisted contract physician Jamie Lewis to review its decision to terminate Engweiler's benefits. (ECF No. 13-13 at PageID.2222.) Dr. Lewis's report to Hartford, submitted on July 9, 2024, was based on the doctor's review of the claim file, including Engweiler's medical records and the SSA decisions denying and then granting Engweiler social-security benefits. (*Id.* at PageID.2211.) Dr. Lewis twice attempted to contact Dr. Moulton to discuss his assessment, on June 27 and July 1, but got no further than the doctor's voicemail on both occasions. (*Id.* at PageID.2216.)

Dr. Lewis's file review led him to conclude that Engweiler's lower-back problems did not bar him from working a full-time job calling for sedentary work or light physical exertion, so long as he did not sit for longer than an hour at a time. (*Id.* at PageID.2216.) Dr. Lewis's assessment appears to have been based largely on Dr. Anderson's examination of Engweiler, with Dr. Lewis discounting the restrictions Dr. Moulton placed on the amount of time Engweiler could spend seated as "not consistent with the examination finding."[4] Dr. Lewis also mentioned "prior disability exams" that "found his function to be consistent with a sedentary to light level," but he did not specify the exam that he regarded as making that finding. Dr. Lewis also inferred that Engweiler's "function was greater than he described" because he "did not want to proceed with further surgery." (*Id.* at PageID.2219.) Dr. Lewis acknowledged that Engweiler suffers from

---

[4] The record of Dr. Anderson's independent examination is not among the file materials listed as within the scope of Dr. Lewis's review. (ECF No. 13-13 at PageID.2216.) The Court infers that the unspecified "examination" Dr. Lewis refers to denotes Dr. Anderson's because its findings correspond to those recorded in Dr. Anderson's report. (*Compare id.* at PageID.2220, *with* ECF No. 13-7 at PageID.1420.)

8

"ongoing chronic pain impacting his activities of daily living," but he did not regard that pain as "prevent[ing] or preclud[ing]" Engweiler from "function[ing] at a sedentary to light level."

In addition to Dr. Lewis's file review, Hartford instructed vocational analyst Megan Herbig to conduct an "employability analysis review" of Engweiler's career prospects based on Dr. Lewis's assessment of Engweiler's ability to work. Herbig determined that Engweiler's engineering background and low-level managerial experience made him highly suited to no less than fifteen occupations, including as a tool planner, logistics engineer, or R&D director. (*Id.* at PageID.2193.) Herbig explained that all the occupations identified were ones that required only sedentary physical capacity and that would permit Engweiler to stand and stretch or change his sitting position throughout the day as needed. (*Id.* at PageID.2189.) Herbig also noted that Engweiler could take any of these jobs with minimal training. (*Id.*) On the strength of these findings, Herbig concluded that there are occupations appropriate to Engweiler's physical condition, skills, and work experience available in "reasonable numbers in the national economy." (*Id.*)

On July 30, Hartford informed Engweiler that it was standing behind its decision to terminate his disability benefits. (*Id.* at PageID.2226.) Hartford gave two interrelated reasons for this outcome. First, Hartford adopted Dr. Lewis's dismissal of Dr. Moulton's functional restrictions: the administrator, after reciting a large portion of Dr. Lewis's findings, stated that Dr. Moulton's opinion on Engweiler's ability to work "is based mostly on . . . Engweiler's report" and that Dr. Moulton "failed to provide any current objective findings that support a sub-sedentary capacity." (ECF No. 13-13 at PageID.2226.) Although Hartford conceded that "it is not unusual for a physician to rely on a patient's subjective assumptions when providing medical care," the administrator went on to find that "the reported restrictions" Dr. Moulton imposed and Engweiler's

9

"pain complaints appear to be out-of-proportion considering the limited existence of objective clinical or physical findings." (*Id.*) Hartford reasoned that "[i]t is not sufficient for an attending physician to issue restrictions without corroborating medical evidence or merely list symptoms or a diagnosis as through it inherently implies a certain level of functional impairment." The administrator concluded that the absence of "clinical findings . . . suggest[ing] medical impairment of the severity that would preclude occupational functioning" in turn rendered the termination of Engweiler's benefits "appropriate." (*Id.*)

Hartford's second justification traveled in the same direction. Hartford acknowledges that Engweiler was awarded SSDI based on a finding that Engweiler was disabled from any occupation suited to his age and experience. (*Id.*) But it notes that "the SSA's determination is not conclusive" since the criteria governing an award of social-security benefits and those applicable under Howmet's disability-insurance plan "are different in critical ways." (*Id.*) According to Hartford, the SSA "may weigh subjective evidence differently" than an adjudicator bound by the terms of Howmet's plan: "SSA gives full deference to a treating physician," whose clinical assessment may uncritically report their patient's "subjective complaints" (*id.*); Hartford, it is implied, is free to give subjective complaints whatever weight the administrator wants because it owes no deference to treating physicians under the plan.

**D.    This Lawsuit**

Having reaffirmed its initial decision, Hartford informed Engweiler of his right under section 502(a) of ERISA to file a civil action for recovery of his disability benefits and of his entitlement to a second-level appeal under the plan. (*Id.* at PageID.2227.) In September, Engweiler elected to challenge Hartford's termination of his benefits in this Court. (ECF No. 1.) Engweiler moved for judgment on the administrative record on April 30. (Mot. J. on

Administrative R., ECF No. 14.)  Howmet opposed (Resp., ECF No. 15), and Engweiler replied (Reply, ECF No. 16).

## II.    LEGAL STANDARD

In this circuit, claims for recovery of benefits under section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), are adjudicated according to the sui generis procedure set out in *Wilkins v. Baptist Healthcare System*, 150 F.3d 609 (6th Cir. 1998).  Whether appropriately construed as a form of summary judgment beyond the confines of Federal Rule of Civil Procedure 56 or as a bench trial conducted on a limited paper record, *see Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 979–80 (E.D. Va. 2005) (assessing *Wilkins* against other circuits' holdings that ERISA cases decided de novo amount to "bench trial[s] on the paper record"), the "judgment on the administrative record" contemplated by *Wilkins* comprises the findings of fact necessary (if any) to sustain or overturn the plan administrator's benefits decision.  That decision commands no deference unless the plan clearly vests the administrator with discretion to interpret the plan and decide on benefit eligibility.  *Kramer v. Am. Elec. Power Exec. Severance Plan*, 128 F.4th 739, 749–50 (6th Cir. 2025).  In the latter case, the administrator's decision must be upheld unless it was arbitrary or capricious.  *Whitaker v. Hartford Life & Accident Ins. Co.*, 121 F. App'x 86, 87 (6th Cir. 2005).

## III.    ANALYSIS

The group plan at issue in this litigation accords discretionary authority to Howmet, and by extension its claims administrator, Hartford.[5]  Consequently, the decision to revoke Engweiler's

---

[5] The parties agree that the arbitrary-or-capricious standard applies to this case.  (Mot. 9; Resp. 9.)  The "unambiguous terms" of the plan, *Williams v. Int'l Paper Co.*, 227 F.3d 706, 711 (6th Cir. 2000), validate that stipulation: the plan explicitly grants Howmet (and Hartford) "discretionary authority" to "[d]etermine eligibility under all Plan provisions" and "[i]nterpret Plan provisions for all participants and beneficiaries" (ECF No. 13-1 at PageID.45).

11

long-term disability benefits is reviewed for arbitrariness or caprice.[6] This forgiving standard, while more than a mere rubber stamp, *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006),[7] requires only that the decision rationally follow from the evidence before the administrator when it made its decision and from the benefit criteria set out in the plan itself. *Shaw v. AT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 547 (6th Cir. 2015); *see Autran v. P&G Health & Long-Term Disability Ben. Plan*, 27 F.4th 405, 411 (6th Cir. 2022) (distinguishing between "procedural" and "substantive" arbitrariness).

Considerations whose relevance has crystallized in Sixth Circuit case law include the medical evidence for and against the decision, the correspondence between the plan's decision and a disability determination by the SSA, the conducting of a physical examination by the plan's medical reviewer, and the effect of any conflicts between the administrator's interests qua adjudicator and qua payor, *see Shaw*, 795 F.3d at 547; the unexplained favoring of some pieces of evidence over others, *see Glenn v. MetLife*, 461 F.3d 660, 670–71 (6th Cir. 2006), *aff'd*, 554 U.S. 105 (2008); and the presence of any inconsistencies or inaccuracies in the administrator's

---

[6] The Sixth Circuit recently joined a number of other courts of appeals in holding that review of a decision by an administrator to whom the benefit plan reserves discretionary authority is properly denominated as review for, naturally enough, abuse of discretion. *See Goodwin v. Unum Life Ins. Co. of Am.*, 137 F.4th 582, 589 (6th Cir. 2025); *accord Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 629–30 (4th Cir. 2010); *Mello v. Sara Lee Corp.*, 431 F.3d 440, 443 (5th Cir. 2005); *King v. Hartford Life & Acc. Ins. Co.*, 414 F.3d 994, 998 (8th Cir. 2005) (en banc); *Wit v. United Behav. Health*, 79 F.4th 1068, 1087 (9th Cir. 2023); *see also Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 210–11, 215 (2d Cir. 2015) (referring to "arbitrary and capricious" and "abuse of discretion" interchangeably). *Contra Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 844 (3d Cir. 2011) (characterizing review as one for arbitrariness); *Bator v. Dist. Council 4*, 972 F.3d 924, 929 (7th Cir. 2020) (same); *LaAsmar v. Phelps Dodge Corp.*, 605 F.3d 789, 796 (10th Cir. 2010) (same). Because it is not entirely clear whether *Goodwin* also renames the review conducted by district courts—although the reasoning motivating the change, that a trustee's decision making is also reviewed for abuse of discretion, would seem to compel that result—the Court uses the older terminology here. In any event, *Goodwin* was at pains to deny that "our circuit's ERISA arbitrariness review . . . buck[s] the Supreme Court's abuse of discretion framework," 137 F.4th at 589, so there is no reason to think any departure from the principles enunciated in the cases using the old label was intended. *See generally* Kennedy, Judicial Standard of Review in ERISA Benefit Claim Cases, 50 Am. U. L. Rev. 1083, 1104 (2001) (explaining adoption of arbitrary-or-capricious standard in ERISA context as continuous with use of that standard in labor law to review decisions by administrators of plans subject to collective bargaining).

[7] *See Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846–47, 847 n.4 (6th Cir. 2000) (deference contemplated by arbitrary-or-capricious review "tempered" by alertness to conflicts of interest when the administrator also funds the plan and by the canon of interpreting insurance contracts against an insurer).

12

conclusions, *see Zuke v. Am. Airlines*, 644 F. App'x 649, 654 (6th Cir. 2016). None of these factors is controlling; the Court's assessment is of the "ultimate decision denying benefits," *Brown v. Fed. Exp. Corp.*, 610 F. App'x 498, 506 (6th Cir. 2015) (quoting *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1066 (6th Cir. 2014)), not the constituent elements of the process issuing in that decision.

A.   **Hartford's Decision Is Supported by the Complete Medical Record**

Perhaps the most important factor in determining if a plan administrator has arbitrarily denied or terminated benefits is whether the administrator has considered the medical evidence before it and reached a conclusion supported by that evidence. *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003); *see Autran*, 27 F.4th at 412 (bifurcating this analysis into presence of "substantial evidence" supporting the decision and requirement that "administrator consider all the evidence"). That is what Hartford did.

Hartford fully acknowledged the assessments of Engweiler's treating physicians. Hartford's final decision was based largely on the file review conducted by Dr. Lewis (ECF No. 13-13 at PageID.2224–.2225), and Dr. Lewis examined all records of Engweiler's visits with Drs. Moulton and Parrett, as well as Engweiler's other medical providers (*id.* at PageID.2212–.2217). Hartford also reviewed Engweiler's social-security file, which itself contained what by all appearances was a comprehensive record of Engweiler's treatment history up to May 2023. (*Id.* at PageID.2225.) Hartford noted that Dr. Moulton—the physician directly responsible for caring for Engweiler's back—regarded him as unable to work, and it recognized that the SSA reached an identical conclusion. Neither during the administrative process nor in his briefing in this Court does Engweiler point to any evidence of his disability that Hartford completely ignored.

It was permissible for Hartford to regard the opinions of Engweiler's medical providers as unconvincing when weighed against contrary evidence in the form of Dr. Anderson's independent

13

examination and Dr. Lewis's file review, which was premised in part on that examination. Dr. Anderson personally assessed Engweiler's physical capabilities (ECF No. 13-7 at PageID.1433–.1439), and he found that Drs. Moulton and Parrett's restrictions on Engweiler's activities were not warranted by what his own observations of Engweiler revealed (ECF No. 13-13 at PageID.2133). When Dr. Lewis evaluated Dr. Anderson's examination against the opinions of Engweiler's treating physicians, his medical judgment led him to find Dr. Anderson's assessment more persuasive. (*Id.* at PageID.2220.) Hartford was entitled to credit Drs. Anderson and Lewis's conclusions over those of Drs. Moulton and Parrett, as claims administrators owe no special deference to the opinions of treating physicians. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). There is substantial evidence in support of Hartford's termination of Engweiler's disability benefits.

**B.    Hartford's Decision Is Not Marred by Other Indicia of Arbitrariness**

Other factors that have frequently been invoked in this circuit, such as making credibility determinations based on a paper record, unexplained inconsistency with a disability determination by the SSA, or the presence of a conflict of interest, do not undermine the rationality of Hartford's decision. *See Autran*, 27 F.4th at 412 (reciting factors).

*First*, while Hartford's final decision relied heavily on Dr. Lewis's review of Engweiler's claim file, that review in turn encompassed Dr. Anderson's independent medical examination. Unlike administrators whose "benefits determination[s]" were held to be of dubious "thoroughness and accuracy" because they relied on credibility assessments made exclusively from cold records, *id.* (quoting *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013)), Hartford insulated against that risk by having Dr. Anderson draw conclusions informed by direct observation about the effect of Engweiler's pain on his ability to work. One independent medical examination is sufficient to "assist" plan administrators, "claimants, and the courts" in reaching "reasoned,

14

principled benefit determinations" by providing objective support for an administrator's dismissal of the opinions of a beneficiary's physicians that the beneficiary is disabled. *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006). To require a duplicate examination by a file reviewer as part of a first-level plan appeal would stray dangerously close to rendering independent examinations obligatory—a proposition the Sixth Circuit has repeatedly denied. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 297 n.6 (6th Cir. 2005); *Filthaut v. AT&T Midwest Disability Benefit Plan*, 710 F. App'x 676, 687 (6th Cir. 2017); *cf. Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013) (holding file-only review unobjectionable when "reviewers made no credibility determinations" and "did not second-guess . . . treating physicians"). And it would contravene the principle that it is the "*plan administrator's* decision to conduct a file-only review" that "might raise questions about the benefits determination." *Judge*, 710 F.3d at 663 (emphasis added); *cf. Kouns v. Hartford Life & Acc. Ins. Co.*, 780 F. Supp. 2d 578, 587 (N.D. Ohio 2011) (faulting Hartford for not "resolving the conflict" between a treating physician and a file review by "arrang[ing] for another doctor to examine" the beneficiary). That Dr. Lewis rather than Dr. Anderson examined Engweiler does not "weigh[] in favor of a determination" that Hartford acted arbitrarily or with caprice. *Guest-Marcotte v. Life Ins. Co. of N. Am.*, 730 F. App'x 292, 301 (6th Cir. 2018) (quoting *Godmar v. Hewlett-Packard Co.*, 631 F. App'x 397, 407 (6th Cir. 2015)).

Nor was Hartford's decision marred by the fact that Dr. Lewis did not interview Engweiler's treating physicians, an omission the Sixth Circuit held fatal to a file-only review in *Cooper v. Life Insurance Co. of North America*. 486 F.3d 157, 168 (6th Cir. 2007). The reviewer there submitted his report to the plan administrator only days after attempting to call the beneficiary's doctors, and he did not convey the urgency of his interview requests in the voicemails he left with the doctors' staff. *See also Shaw v. AT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538,

15

549 (6th Cir. 2015) (twenty-four-hour window for responding to file reviewer's interview request weighs in favor of benefits denial's arbitrariness). Here, by contrast, Dr. Lewis tried to call Dr. Moulton on June 27 and July 1, and his report was not submitted until July 9. On both occasions Dr. Lewis left what he described as "detailed" voicemails. Although nothing in the administrative record independently verifies the voicemails' contents, neither does Engweiler point to any evidence that Dr. Moulton was unaware of Dr. Lewis's efforts to solicit his input. More importantly, Dr. Moulton's statement in support of Engweiler's appeal—which amounted to little more than a word-for-word reiteration of Dr. Moulton's original assessment of Engweiler's physical capabilities (*see* ECF No. 13-8 at PageID.1499)—was made available to Dr. Lewis, and Dr. Lewis gave a rational explanation for rejecting Dr. Moulton's opinion. That was enough to obviate the need for Dr. Lewis to interview Dr. Moulton, in accordance with the holding in *Helfman v. GE Group Life Assurance Co.* that consideration of a treating physician's submissions to the plan administrator can stand in lieu of a file reviewer's interviewing those physicians. 573 F.3d 383, 393–94 (6th Cir. 2009).

*Second*, Hartford's termination of Engweiler's benefits only months after the SSA deemed him disabled was not capricious. Engweiler appeals to *Calvert v. Firstar Finance* as establishing that an independent examination at odds with a disability determination by the SSA is "incredible." 409 F.3d 286, 296 (6th Cir. 2005). *Calvert* undoubtedly treats an SSA disability award as "one factor the Court should consider, in the context of the record as a whole, in determining whether" a plan administrator's "contrary decision was arbitrary and capricious." *Id.* at 295. But it *held* such an inconsistency arbitrary and capricious because the administrator relied "almost exclusively on the conclusions" a contract physician "reached after his file review" and the review "never addresse[d] head on and simply seemed to ignore" the SSA's determination that the beneficiary

16

was disabled. *Id.* at 296–97. In that respect, *Calvert* does no more than apply the principle that the administrator must consider the entire record and explain why it discounts evidence contrary to its decision. *See Bennett v. Kemper Nat. Servs.*, 514 F.3d 547, 554 (6th Cir. 2008) ("failure to discuss the SSA's disability determination" rendered contrary determination by plan administrator arbitrary). *Compare Universal Camera Corp. v. NLRB*, 340 U.S. 474, 489 (1951) (articulating rule that agency decision must be supported by substantial evidence on the entire record), *with Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 119 (2008) (approving of appeals court's "focus[ing] more heavily on" how administrator "ignored" SSA's determination that beneficiary "could in fact do sedentary work"), *aff'g Glenn v. MetLife*, 461 F.3d 660 (6th Cir. 2006).

It cannot be said that Hartford paid no heed to the SSA's awarding disability benefits to Engweiler. Hartford's final decision devotes about as much space to explaining why it did not regard the agency's conclusion as decisive as it does to its assessment of the medical evidence indicating that Engweiler is not totally disabled. (ECF No. 13-13 at PageID.2226.) Engweiler instead argues that the reasons Hartford gives for its contrary conclusion are incorrect. (Mot. 21.) Engweiler rightly points out that Hartford erroneously claims the SSA "gives full deference" to the medical opinion of a treating physician, an evidentiary rule the SSA abandoned in 2017. *See Francis v. Saul*, 558 F. Supp. 3d 527, 532–33 (E.D. Mich. 2021). But that error does not undermine the soundness of the proposition that Hartford is entitled to give less credence to the opinion of a treating physician than the SSA. Hartford was reasonably (albeit respectfully) clear when explaining its final decision that it found its contract physicians' assessments of the functional limitations imposed by Engweiler's back pain more credible than those of his medical providers. Hartford's misstatement of operative SSA regulations is of no moment to the permissibility of that conclusion.

## IV.     CONCLUSION

Hartford's termination of Engweiler's long-term disability benefits was neither arbitrary nor capricious. The Court will therefore deny Engweiler's motion for judgment on the administrative record and will dismiss this action.

An order and judgment consistent with this Opinion shall issue.


Dated: August 12, 2025                             /s/ Hala Y. Jarbou
                                                   HALA Y. JARBOU
                                                   CHIEF UNITED STATES DISTRICT JUDGE